Harry B. Frank, J.
The actions herein, which were tried jointly before me, are brought against the defendant, New York City Transit Authority, by Esther Chaney, as administratrix of the goods, chattels and credits of Walter Chaney, deceased, for the wrongful death of said Walter Chaney and for his conscious pain and suffering, and by Kostos Godulas, for damages for personal injuries.
Decision was reserved on motions made by the defendant and third-party defendant to dismiss the complaints and for directed verdicts, and the case was submitted to the jury. Verdicts having been rendered in favor of both plaintiffs, the defendant and third-party defendant have moved to set aside the verdicts.
All motions on which decision was reserved are hereby denied.
The uncontradicted facts are to the effect that on May 10, 1955, both the decedent and plaintiff Godulas were working *833 as painters at the 181st Street station of the Independent Subway Line, operated and controlled by the defendant, New York City Transit Authority. They were the employees of George Campbell & Co., the third-party defendant herein, an independent contracting firm engaged under a contract to perform certain painting work for the defendant. The accident involved occurred on the afternoon of that date, at which time both men were working at the north end of the station, near the 184th Street entrance, on the southbound side of the mezzanine platform. They were engaged in painting a ceiling over a flight of steps leading from the mezzanine platform to the station platform below. The two men were working from rigging comprised of planks, called kickers, and which might commonly be referred to as scaffolds. The kickers involved, and the evidence indicates that there were two such kickers or planks, were supported by ladders and the guard railing surrounding the stair well. More specifically, one kicker, over 20 feet in length, ran from the rung of an extension ladder, located at the foot of the staircase on the station platform, to the rung of a stepladder standing on the stairway itself Extending perpendicularly from that kicker was a second kicker which ran to the iron guard railing surrounding the stair well. The end of the second kicker projected some three feet beyond the railing into the mezzanine passage area. The stair well area involved, known as Stair well, P-15, included the flight of stairs above which the painting was being done, and another stairway some 10 feet away, also leading from the mezzanine to the station platform below. It was the stair-well for southbound trains nearest to the 184th Street entrance of the station, and was the usual stair well used by southbound passengers to get to the station platform below.
At approximately 2:15 p.m., while both Chaney and Godulas were working from the kickers, a passenger coming through the mezzanine passage area struck the end of the kicker which extended into that mezzanine area, causing both men to fall from the kickers to the station platform below, a distance of approximately 20 feet. Chaney, who fell first onto the roof of an incoming train, and then to the station platform, died in a hospital later that afternoon; and Godulas, who fell directly to the station platform below, sustained severe injuries. The kickers did not fall when the men did.
The evidence indicates that the immediate entrances to the stairways comprising the stair well were blocked off. Factually, the most disputed issue is whether there were ropes around that *834 portion of the mezzanine passageway where the kicker projected out three feet past the railing, or whether the projecting end of the kicker was completely exposed and unprotected. There is testimony on behalf of the plaintiffs which indicates that this area was unroped and unguarded, with nothing to prevent passengers from coming into that immediate vicinity. Such testimony was given by plaintiff Godulas and by Schlosser, the person who bumped into the plank. Schlo.sser further testified that at the time of the accident there were about a dozen or more people around him coming through the mezzanine passageway, and that another passenger brushed against him, causing him to lose his balance and hit the projecting end of the kicker. There is testimony from other witnesses to the effect that the area surrounding the end of the kicker was roped off, although such testimony varies as to the exact manner of such roping off, and other details.
During the painting operation three of defendant’s employees were operating as flag men on the station platform and tracks. Their function was to protect the painters from train movements within the station, and they used safety signals and other equipment for that purpose.
The evidence further indicates that the defendant had one Peter McGuire continually on the job as a paint inspector. He testified in his examination before trial, portions of which were read at the trial, that he was on the job daily from 7:00 a.m. to 4:00 p.m., that it was his duty to see that the defendant got a good paint job according to specifications, and that as part of his job he observed the method and means used in doing the work. He also testified that it was his duty to see that the painters did not interfere with the passengers, and in that connection he would tell them to rope off the area where they were working if they did not rope it off themselves. Plaintiff’s witness Berman, the union representative on the job for Campbell, in referring to McGuire’s duties, testified that it was the inspector’s job to see that all safety precautions were taken, that he painters were not too near the track and that he would check the rigging to see that the ladders were firm and secure.
While the evidence indicates that McGuire was not present at the time of the accident, and he stated that he did not recall seeing the rigging set up, he did testify that when he left, at about one o’clock of that afternoon, he knew that the painters were working around the stairway.
In response to the question by counsel for Chaney: “Were you aware when you left the platform at about 1:00 o ’clock that the painters would be working on the ceiling that afternoon? ” *835 McGuire responded: “ Well, I imagine if they were around the stairway and they had the stairway closed that they would work around the ceiling, yes.”
As to his qualifications, he testified that he was “ familiar with all the rigging that a painter uses pertaining to that kind of work ”. He also admitted that part of his duties included advising the flagmen where the painters would be working. There is testimony on the part of defendant’s witness, Poitras, Campbell’s foreman on the job, that the scaffolding involved was put up in the morning, which would have been while McGuire admittedly was present.
In connection with the rigging itself, Poitras testified that it was an approved method of putting up the scaffold. His testimony in regard to the extension of the kicker beyond the end of the railing was that it ‘ ‘ has to extend over the rail, for safety purposes ”. Plaintiff’s witness, Berman, also testified that this was the proper type of rigging for that spot. McGuire, too, indicated that this was the usual type of scaffold for painting ceilings.
The only testimony to the effect that there was anything unsafe about the rigging was Berman’s testimony that it was bad practice not to tie down the ends of the kickers.
The court submitted the case to the jury on the theory that defendant owed to these men, employees of an independent contractor, the duty of exercising reasonable care to make safe the place of work provided by it and the ways and approaches to the place of work. The jury was clearly instructed that the scaffold, or kickers, on which the men were working, were pieces of equipment or apparatus supplied by the contractor, and that, with regard to such equipment or apparatus, defendant had no duty to make them safe. The jury was further instructed that with regard to the two men here involved, the defendant did have a duty to exercise reasonable care in maintaining the ways and approaches that were necessary and suitable for them to perform their duties in a condition of reasonable safety.
Any discussion of negligence in the instant case must necessarily determine what duty was owed by the defendant to the decedent and Godulas. ‘ ‘ ‘ In every instance, before negligence can be predicated of a given act, back of the act must be sought and found a duty to the individual complaining, the observance of which would have averted or avoided the injury ’ ’ ’ (Palsgraf v. Long Is. R. R. Co., 248 N. Y. 339, 342). The facts here present focus attention on the “ duty to provide a safe place to work ”.
*836 The extent and meaning of the duty to provide a ‘ ‘ safe place to work ” can best be evaluated by viewing it within the framework of the underlying legal relationship existing between the employees of the contractor and the defendant. Chaney and Grodulas were business invitees present upon the defendant’s premises, at its instance, and for purposes connected with its business. As such invitees the' defendant owed them a duty of providing a reasonably safe place for the performance of the work that they had been retained to do. (Haefeli v. Woodrich Eng. Co., 255 N. Y. 442; Koehler v. Grace Line, 285 App. Div. 154; Prosser, Law of Torts [2d ed.], § 78, pp. 452, 453.) Or stated in terms applicable to the more specific relationship herein involved, an occupant of land owes to the servants of an independent contractor, employed to do work thereon, the duty of exercising ordinary care to render the premises reasonably safe for the performance of the work. (Haefeli v. Woodrich Eng. Co., supra; Wohlfron v. Brooklyn Edison Co., 238 App. Div. 463, affd. 263 N. Y. 547.)
Section 200 of the Labor Law is a statutory recognition of the common-law obligation and is declaratory of the common law to the extent that it imposes upon the employer the duty of exercising reasonable care. (Sgandurra v. 220 Estates, 185 Misc. 283, affd. 270 App. Div. 834.)
Judicial refinements of the general rule have, in a negative sense, delineated the physical area to which the duty extends. Thus, it has clearly been held that the employer has no duty of exercising reasonable care to make safe scaffolds, or other apparatus or equipment, supplied by the independent contractor to its own employees, and that such agencies do not come within the purview of the duty laid down by section 200 of the Labor Law. (Hess v. Bernheimer & Schwartz Brewing Co., 219 N. Y. 415; Iacono v. Frank & Frank Contr. Co., 259 N. Y. 377.) It is important to evaluate the precise emphasis to be placed upon such limitation in its relationship to the general rule. This can perhaps be best accomplished by an appraisal of the factual patterns which have called the exception into play. Most pertinent is the finding that in these cases the proximate cause of the accidents involved was a defect in the very scaffold or apparatus to which the duty did not apply. (See Gambella v. Johnson & Sons, 285 App. Div. 580; Butler v. D. M. W. Contr. Co., 286 App. Div. 828, affd. 309 N. Y. 990.) In the instant case, the evidence is more than ample to sustain a contrary conclusion — that the proximate cause of the accident was not a defect in the equipment, but rather, dangerous conditions external to the equipment and existing in the employer’s plant. A review of the record indicates that the only evidence submitted in connec *837 tion with any defect in the rigging was testimony to the effect that the end of the kicker was not tied down. As to the projection of the kicker some three feet beyond the railing and into the mezzanine area, defendant’s witness Poitras testified that such placement was, in fact, necessary for “ safety purposes ”. There is no evidence to indicate that the proximate cause of the accident was the untied end of the kicker. The failure of the planks to fall when the men and paint buckets did makes an inference to the contrary compelling. The cause of the accident here was a jolt to the plank by a passenger, and the record impels the.inference that the resultant fall of the men was due to the vibrations of the jolt and would undoubtedly have occurred even if the end of the kicker had been tied down.
Thus, we are faced with a fact pattern wherein the employees of the independent contractor were working on planks or kickers, which were part of their own employer’s “ plant ”, and which the instant defendant had no duty to make safe, but the proximate cause of the accident was not a defect in that equipment, but rather an unsafe condition external to the equipment, and on the contractee’s premises. While this fact pattern does not fall into any easily discernable niche, a realistic appraisal of the meaning of the duty under section 200 of the Labor Law indicates that application of the section is warranted under these circumstances.
The defendant seeks to put a distorted and unduly restrictive interpretation on that duty. It is apparently defendant’s contention that its duty to provide a ‘ ‘ safe place to work ’ ’ is confined to the exact geographical situs where the work is being performed at the time of the accident, in this case the kickers or planks on which decedent and Go dulas were working, and that since defendant had no duty to make such kickers reasonably safe, the only duty which it owed to the two painters was to provide them -with safe approaches to the work, in the sense of “ passageways provided for use of the workmen in reaching and leaving the place where they are working ”. Defendant’s contentions are untenable and at variance with the precedents and the fundamental meaning of the duty involved.
Looking first to the meaning of “ ways and approaches ” to the place of work, the case of Caspersen v. La Sala Bros. (253 N. Y. 491) is of particular pertinence. In that case, the plaintiff, an employee of an independent contractor, was engaged at his work of installing an elevator in the defendant’s building. Beside the elevator well, where he was working, was a shaft for a stairway. While intent upon his work, he was struck by a brick which fell from a scaffold on which other workmen were *838 working far np in that shaft. The court held (p. 494) that “ the owner * * * was under a duty * * * to use reasonable care in maintaining the approaches to the elevator in a condition of reasonable safety, and is answerable in damages if the duty was ignored. * * * He [the plaintiff] had come into the building in furtherance of the owner’s business, and was using ways and approaches necessary or suitable to enable him to go forward with his work.” The similarity between the Gaspersen case and the case at bar is inescapable. In both situations, the workmen were stationed at the situs where the actual work was being performed, and in both cases the injury was brought about by an intervening agency which travelled through an “ approach ” to the place where the work was being performed. The fact that in Gaspersen the agency that caused the injury was an inanimate object falling from above, and in the case at bar it was a human agency approaching horizontally, in no way affects the extent of the defendant’s duty as it regards “ ways and approaches ”. The principle is clear that the duty of using reasonable care to maintain such “ approaches ” in a condition of reasonable safety applies to the time when the work is being performed, and refers to the physical approaches to the situs where the work is being done, and not merely to passageways provided for use of the workmen in reaching and leaving the place where they are working, as the defendant contends. The key words in this regard are ‘ ‘ and was using ways and approaches necessary or suitable to enable him to go forward with his work ”. In the case at bar, the projection of the kicker into the mezzanine area was a necessary adjunct of going forward with the work.
The Gaspersen case talks of the falling brick as ‘ ‘ perils unknown to the worker ” (p. 495). To a painter perched on narrow planks more than 20 feet from the ground, and intently engaged in his work of painting an overhead ceiling, a moving passenger is much the same type of “ unknown peril ”.
Indeed, in seeking to confine the “ place of work ” exclusively to the planks and kickers alone, to which, concededly, it had no obligation, the defendant is again propounding too narrow a view and one which would evade the fundamental intent of the statute. There is no geographical formula which can be used to delineate the “place of work”, and the physical facts of each case must necessarily be determinative, but the precedents are helpful in establishing guides. The descriptive words used in the leading authorities wherein the rule is enunciated are broad rather than limiting ones. In Haefeli (255 N. Y. 442, supra) the duty is to render “ the premises ” reasonably safe *839 for the performance of the work. In Gaspersen {supra, p. 494) reference is made to the ‘ ‘ plant ’ ’ furnished by the employer. In Hess v. Bernheimer & Schwartz Brewing Co. (219 N. Y. 415, 418, supra) it is stated that “ the statute [Labor Law, § 200, subd. 1] refers to the employer’s plant and not to the contractor’s equipment ”. The tenor of these pronouncements indicate that in the instant case the mezzanine area around the rigging, which was part of defendant’s plant or premises, was part of the “ place of work ”, and the defendant had the duty of exercising reasonable care in regard to that area, even if it had no such duty in connection with the rigging itself. (Cf. Dittiger v. Isal Realty Corp., 290 N. Y. 492.)
Of course, an essential consideration in regard to whether or not the employer has a duty to exercise reasonable care in a particular locale revolves upon the issue of control of the area. If the area where the accident occurred, even if it were part of the employer’s plant, were turned over to the contractor and was solely within the contractor’s control, then the employer would be under no duty to the contractor’s employees with regard to that area. {Zucchelli v. City Constr. Co., 4 N Y 2d 52; Olsommer v. Walker & Sons, 4 A D 2d 424, affd. 4 N Y 2d 793.) In the instant case, however, the facts are quite to the contrary. While the work was being performed, the defendant continued to carry on its business of operating a subway station as usual. It continued in full and complete control of its station and in complete control of train and passenger movements. There is no evidence whatsoever to indicate that control of any portion of the premises was given over to the contractor, or that the contractor had any authority to direct passenger traffic.
Thus, whether the mezzanine area around the projecting kicker be considered asan“ approach ’ ’ to the ‘ ‘ place of work ’ ’, or a part of the ‘ ‘ place of work ’ ’ itself, it is clear that under the circumstances here, where the defendant retained control of that area, it had the duty to exercise reasonable care to make that area reasonably safe for the decedent and G-odulas.
Parenthetically, it is interesting to note that the defendant itself recognized that it did have a duty to provide for the safety of these men in connection with parts of the station within its control and geographically away from the exact place where the men were working. In that regard, it set up an elaborate system of controls and flagmen to protect the painters against train movements, an activity which was going on in an area physically removed from the precise location where they were working, but which was, significantly, taking place in a part of the defendant’s “ plant ”. Unfortunately, it failed to exercise *840 the same degree of care and foresight in connection with the safety of the mezzanine area, another portion of its own plant to which its duty extended. However, defendant’s failure to recognize the full extent of the duty which it owed to the painters, did not relieve it of the obligation to fulfill that duty.
Turning to defendant’s contention that the obligation of maintaining the mezzanine area around the kicker in a reasonably safe condition lay on the contractor, and its employees, such argument also fails to provide the immunity which it seeks. The duty imposed upon the defendant to provide a safe place to work, and safe ways and approaches, is a nondelegable one. (Wohlfron v. Brooklyn Edison Co., 238 App. Div. 463, supra; Adams v. Brell Constr. Corp., 110 N. Y. S. 2d 682; Kuhn v. Carlin Constr. Co., 154 Misc. 892.) It cannot discharge that duty by shifting the burden to others, and particularly to those for whose very benefit the obligation exists. To hold otherwise would nullify and render meaningless the duty legally imposed upon it. The facts present here further point up the infirmity of this position. Under all the circumstances herein, reasonable care to provide a reasonably safe mezzanine area, while the painters were working from the kickers, might well have required complete suspension of passenger traffic through the turnstiles at the 184th Street entrance, or, alternatively, effective blocking of the area to provide the necessary safety might have required the placement of ladders, or other equipment, in such a way as to materially interfere with passenger movements. Certainly the contractor, and his employees, had neither the authority, nor requisite control of the premises, to institute such measures. As indicated, complete control of the station, and its operation, remained in the defendant and only it could have taken such steps. The duty to make the mezzanine area reasonably safe rested squarely upon the defendant and because such duty was nondelegable, the defendant alone is answerable if that duty was improperly discharged, whether it acted itself to perform the duty or whether it sought to use the assistance of others in the performance of the duty. (See discussion in Sciolaro v. Asch, 198 N. Y. 77.)
Concluding that the defendant herein had the responsibility to make the mezzanine area reasonably safe, there is ample evidence to sustain the jury’s finding that the defendant failed to properly discharge its oblig'ation. In determining whether or not ordinary care has been exercised, the test is the foreseeability of the risk. (Le Roux v. State of New York, 307 N. Y. 397 and cases cited therein.) Ordinary care must be in proportion to the danger to be avoided and the consequences that *841 might reasonably be anticipated from the neglect. (Sadowski v. Long Is. R. R. Co., 292 N. Y. 448.) The facts herein indicate that the danger to be anticipated from, defendant’s conduct was most apparent. There is evidence from which the jury could have found that passengers were permitted to enter that particular portion of the mezzanine passageway where the end of the kicker lay exposed, and that no measures whatsoever were taken to keep passengers away from that point. The entry of passengers was unchecked and unsupervised. The physical location of Stairwell P-15 in relation to this incoming traffic made this unchecked entry of passengers a particular source of potential danger. It was the stair well nearest to the turnstile entranceway and was the stair well that was ordinarily used by incoming southbound passengers to reach the station platform. Furthermore, this turnstile entranceway appeared to be a very active one since it serviced two points of entry, a passageway and elevators. There were no signs or guards posted to put incoming passengers on notice that the stair well was blocked off and that work was being performed there, and that part of the scaffold extended into the mezzanine area. The jury could have found that the first knowledge that passengers received of these facts was upon actually approaching the immediate place where the work was going on. The propensities of subway passengers to be preoccupied and unseeing is common knowledge, and such propensities are particularly well known to the operators of a subway line. Indeed, all types of persons, including blind persons, nearsighted persons and persons with other visual defects are known to be subway users. Therefore, it was certainly foreseeable that by permitting passengers to enter the mezzanine passageway where the men were working without taking any measures or precautions to keep the passengers away from that place, a dangerous condition from which injury might ensue would be created.
The fact that the specific cause of the accident was the conduct of a particular passenger does not operate to relieve the defendant under the circumstances here present. If such conduct was reasonably to be anticipated then there was no break in the chain of causation of such character as to relieve the actor from liability. (Carlock v. Westchester Light. Co., 268 N. Y. 345; Ranney v. Habern Realty Corp., 281 App. Div. 278, affd. 306 N. Y. 820; Prosser, Law of Torts [2d ed.], § 49, p. 268.) Certainly the tendencies of average subway passengers to be careless, to engage in pushing and jostling, and to fail to look carefully where they are going, are all well known, particularly to one in defendant’s position. When such persons are permitted *842 to proceed freely through a mezzanine passageway at a place where an unguarded and unprotected end of a kicker extends, contact between a passenger, or passengers, and that kicker is clearly within the zone of apprehension. The dangerous condition, here, was brought about by defendant’s insistence upon “ business as usual ”, while the painters were engaged in their work. Under ordinary circumstances, the movement of passengers through the mezzanine area would not, as such, have constituted a dangerous condition, but the additional factor of the presence of the workmen on the kickers combined to make such unchecked traffic dangerous, and consequently made the mezzanine area “ unsafe ” for the workmen.
While the foregoing is based upon that version of the evidence which indicates that there were no ropes, or other protection, around the projecting end of the kicker, the same conclusion would ensue even if the jury accepted that version of the evidence which was to the effect that the area around the end of the kicker was in some way roped off. There was sufficient evidence from which the jury could have found that such roping off alone was not sufficient to make the area reasonably safe. It was quite foreseeable that passengers anxious to catch an incoming train might duck under the ropes, and that if ropes alone were used as barriers, the posting of guards would also be necessary. Indeed, there is testimony showing that passengers in the past had ducked under ropes where they were used alone. Under the circumstances here, and in view of the nature of the work being performed, the jury could have found that reasonable care required a complete suspension of passenger traffic through the 184th Street entranceway for the period necessary to paint the ceiling over the stair well, particularly since the painting of the ceiling was taking place during non-rush hours, and could have been completed in a relatively short time. Furthermore, this was not the sole entranceway to the station. In any event, there are sufficient facts here present to sustain the jury’s finding that the defendant failed to exercise the reasonable care necessary under the circumstances to properly discharge the duty which it owed to Chaney and G-odulas.
As to notice, the evidence sustains a finding that the defendant was aware of the existence of a condition of danger in the mezzanine area. It was aware of the type of work being performed by the contractor’s employees. It had a supervisor continually on the job who knew where in the station the men were working, and whose duties, by his own testimony, included notifying the flagmen of the specific whereabouts of the painters. *843 He testified that on the day of the accident he knew where the men were working at 1:00 p.m., when he left the premises, and that he realized that they would he working on the ceiling that afternoon. He further testified that he was familiar with all types of rigging, and that the rigging used here was the usual type for painting ceilings under these conditions. As to passenger movements in that mezzanine area, the defendant was fully aware of the nature and extent of such movements since it had full and complete control of them. Thus, even accepting McGuire’s testimony that he did not actually see the rigging set up, these facts are enough to charge the defendant with knowledge of the presence of these workmen, on kickers, in the mezzanine area (cf. Pike v. Consolidated Edison Co., 303 N. Y. 1) and that because of their presence the flow of passengers in that area constituted a dangerous condition against which it should have acted to protect these painters. Furthermore, there is testimony to the effect that the rigging was erected in the morning of the day of the accident, when McGuire admits he was present, and thus defendant would have had actual notice of the exact physical location of the rigging in the mezzanine area.
Therefore, since the defendant had a duty to exercise reasonable care to make the mezzanine area reasonably safe for Chaney and Godulas, and since the evidence is ample to sustain the conclusion that defendant failed to exercise the requisite care under the circumstances after having notice of the existence of a dangerous condition, the jury’s verdicts herein should not be disturbed.
The claim of the New York City Transit Authority against George Campbell & Co., the third-party defendants, was taken from the jury and reserved for disposition by the court, on the consent of the parties. The Transit Authority seeks judgment over on the basis of an indemnity provision contained in the contract between the two, in evidence as plaintiff’s Exhibit 5. The pertinent provision is as follows:
Responsibility for Injuries to Persons and Property. The Contractor shall he solely responsible for all .injuries to person or damages to property occurring on account of or in connection with the work hereunder and shall indemnify and save harmless the Authority from and against liability, loss and expense (including, but not limited to, loss and expense because of liability for the payment of Workmen’s Compensation under the Workmen’s Compensation Law of the State of New York) arising out of injuries (including death) to persons (including, but not limited to, employees of the Authority and employees of the Contractor) or damage to property (including, but not limited to, property of the Authority) occurring on account of or in connection with the work hereunder, irrespective of the actual cause of the accident *844 and irrespective of whether it shall have been due to negligence of the Contractor or negligence of the Authority, their respective agents, servants or employees. The liability of the Contractor under this contract is absolute and is not dependent upon any question of negligence on the part of the Contractor, or on the part of the Authority, or their respective agents, employees, servants or contractors. The approval by the Engineer of the methods of doing the work or the failure of the Engineer to call attention to improper or inadequate methods or to require a change in methods or to direct the Contractor to take any particular precautions or to refrain from doing any particular thing shall not excuse the Contractor in ease of any such injury to person or damage to property.
The terms of the provision are unambiguous, and clearly envision indemnification of the Transit Authority in the instant type of situation (see Fuller Co. v. Fischbach & Moore, 7 A D 2d 33).
The third-party plaintiff is intitled to judgment against the third-party defendants in accordance with the respective verdicts, and the clerk is directed to enter same in accordance herewith.